**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| JONATHAN CARDELLA and JAMES MOYLE | Case No. 2:07 cv 1003 BCW |
| Plaintiffs, | **ORDER AND MEMORANDUM DECISION** |
| vs. | |
| MOUTNAIN RESERVATIONS, INC. and CASTLES TRAVEL, INC., | Magistrate Judge Brooke C. Wells |
| Defendants. | |

This case arises from a dispute concerning consulting agreements allegedly entered into by the Plaintiffs Jonathan Cardella and James Moyle during the sale of the company they worked for, OTravel, to Defendant Castles Travel. Plaintiffs and Defendants have filed cross-motions for summary judgment concerning the nature and existence of any agreements entered into during the transaction.[1] The court heard oral arguments on the competing motions.[2]

On March 10, 2009, the court granted Plaintiff's Motion to Dismiss Complaint as to James Moyle. Jonathan Cardella remains as Plaintiff. For ease of convenience much of the court's decision refers to both Plaintiffs. As outlined below, the court finds the consulting

---

[1] Docket nos. 41, 45.
[2] Ryan Sherman of McGrane, Nosich & Ganz P.A. and Randall B. Bateman of the IP Law Group represented Plaintiffs. Richard M. Hymas and Erin T. Middleton of Durham Jones & Pinegar represented Defendants.

agreement is a valid and enforceable contract as to Jonathan Cardella and so Defendants are entitled to partial summary judgment.

### BACKGROUND[3]

In 2001, Plaintiffs founded Ski West, Inc. Cardella served as Ski West's CEO and Moyle served as its President. Ski West was an online ski vacation rental distributor. Ski West contracted with property owners throughout much of the United States and British Columbia to rent their properties to prospective vacation customers. Ski West also contracted with ancillary service providers, such as ski rental or ground transportation companies, to sell their services to customers. After building and expanding Ski West, on approximately June 24, 2005, Plaintiffs and the other shareholders of Ski West sold their company to Overstock.com, Inc.

Overstock renamed the company OTravel.com Inc. As part of this sale Plaintiffs were required to stay on as officers or employees of OTravel for a minimum of one year. Cardella became CEO of OTravel and Moyle became President of OTravel. During the fall of 2006 Overstock sought to sell OTravel and Plaintiffs became involved in helping Overstock locate a purchaser. Cardella met Julian Castelli who represented Castles Media Inc. and Kinderhook Industries (Castles Group). Castles Group was interested in purchasing OTravel and in late February, 2007, Castles Group proposed a purchase of OTravel from Overstock. Castles Group created Castles Travel, Inc. to be the entity to purchase and own OTravel and decided to change the name of OTravel following purchase to Mountain Reservations, Inc. The final closing date

---

[3] The material facts relevant to the court's holding are not in dispute.

2

for the sale of OTravel to Castles Group took place on April 25, 2007.  On April 10, 2007,

however, Plaintiffs effectively resigned from OTravel.  Also prior to the closing, the parties

exchanged a number of documents and entered into various agreements.[4]  The documents most

central to the instant dispute are the 2007 Stock Purchase Agreement, the Mutual Release, the

April 24, 2007 draft Consulting Agreement and the Execution Copy.[5]

**A. 2007 Stock Purchase Agreement**

Overstock, OTravel and Castles Travel entered into a stock purchase agreement (2007

SPA) on April 24 2007.[6]  The 2007 SPA did not take effect until closing.  The 2007 SPA

contains a merger clause that states:

> Entire Agreement.  This Agreement and the agreements and documents referred to herein contain the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings, whether written or oral, relating to such subject matter in any way including, without limitation, the letter of intended dated February 21, 2007, between the Company and Kinderhook Industries, LLC, as such letter may have been amended.[7]

Plaintiffs did not sign the 2007 SPA and were not a party to it.

---

[4] An index to the closing set of documents for the sale of OTravel to Castles Group is attached as exhibit 4 to the Declaration of Ryan H. Sherman.  It is filed under seal with the court.
[5] While there were multiple versions of the Consulting Agreement, the court finds the most important versions to the parties' arguments and the court's decision are the 4/24/07 draft and the Execution Copy.
[6] The 2007 SPA is attached as exhibit 4 to the Declaration of Ryan H. Sherman and is filed under seal.
[7] 2007 SPA ¶ 9.8.

**B. Mutual Release Agreement**

In contrast to the 2007 SPA, Plaintiffs were a party to a Mutual Release Agreement entered into by the Plaintiffs, their minority partners, Overstock and OTravel.[8]  These parties signed the Mutual Release Agreement on April 24, 2007 and it did not take effect until the Closing.  Among the provisions contained within the Mutual Release are the following: a reaffirmation that Plaintiffs would not compete with "the business of Overstock.com, Inc., OTravel.com, Inc. or any of their subsidiaries"[9]  for eighteen (18) months after the termination of their employment from OTravel or any of its subsidiary corporations; an express confirmation that the Plaintiffs' employment with OTravel and or its subsidiary corporation was effectively terminated as of April 10, 2007;  a release clause releasing Overstock, Plaintiffs and their minority partners from any and all currently known or unknown claims, suits, or liabilities arising from the sale of Ski West to Overstock or anything that arose during the Plaintiffs employment with OTravel; and, a provision releasing the approximately seven hundred thousand dollars ($700,000.00) being held in escrow by Overstock and OTravel since the time Overstock purchased Ski West from the Plaintiffs and their minority partners.  The escrow provision explicitly states that the release of the escrow funds is "Conditioned upon closing the sale of all

---

[8] The Mutual Release Agreement is attached as exhibit A to Plaintiffs' memorandum of law in support of their motion for summary judgment.
[9] Mutual Release Agreement p. 2.

or substantially all of the capital stock in OTravel.com, Inc. by Overstock.com, Inc. to Castles

Travel, Inc;"[10]

     In similar fashion to the 2007 SPA, the Mutual Release Agreement also contains a

merger clause.  It states:

> Entire Agreement.  This Agreement sets forth the entire understanding of the parties with respect to the subject matter hereof.  Any previous agreements or understandings (whether oral or written) between the parties regarding the subject matter hereof are merged into and superseded by this Agreement.  This Agreement and all provisions, covenants and conditions herein shall be binding and enforceable by the successors of the parties hereto."[11]

     Three employees of OTravel, Thomas Raudorf, Alan Mao, and Joe Illescas,[12] accepted

Castles Group's offer to remain employees after the Closing.  Each of them signed a new

employment agreement containing three-year non-compete and non-solicitation clauses.

Plaintiffs also received an offer to become full or part-time employees of OTravel-which became

Mountain Reservations following the closing-but Plaintiffs, chose not to accept this offer.

Instead, Plaintiffs negotiated a consulting arrangement in which they could provide services to

the new company while still being allowed to pursue additional ventures on their own.

     The practice at Kirkland & Ellis (K&E)-who represented Defendants during the

transaction-when handling a large transaction involving multiple agreements and many parties

was to complete the documents as much as possible and then have the parties sign separate

---

[10] *Id.*

[11] *Id.* at p. 3.

[12] These individuals also were minority owners in Ski West and owned approximately 7.4% of the company prior to its sale to Overstock.

signature pages.  The signature pages were kept on record until the final agreement was reached.

Once the parties reached a final agreement, the signature pages were placed with the final

agreement to evidence the parties' acceptance of the agreement.  If a final agreement was not

reached, the signature pages would be destroyed.

Pursuant to this procedure, K&E attorneys emailed signature pages to all persons who

would be signing agreements in connection with the transaction, including Plaintiffs.  Plaintiffs

do not dispute K&E's procedure or the fact that Plaintiffs received signature pages..

### C.  The 4/24/07 Draft Consulting Agreement[13]

The court notes there is some dispute between the parties concerning the necessity of the

Consulting Agreements for the Transaction to close.  Plaintiffs assert that they did not believe the

Consulting Agreements were necessary for the Closing.[14]  In contrast, Defendants argue that

Plaintiffs understood the Consulting Agreements were necessary to close the Transaction.

During depositions, Cardella testified that Castelli represented he needed the contract to close.

But, according to Cardella this was a factual representation and just "more posturing

negotiation."[15]  Similarly, Moyle testified during his deposition, that he was told the consulting

---

[13] Defendants refer to this document as the "Final Consulting Agreement."  Plaintiffs take issue with that
characterization and call this document the 4/24/07 draft Consulting Agreement.  The court refers to this document as
the 4/24/07 draft Consulting Agreement or the 4/24/07 draft.  In the court's view, referring to this document as
the Final Consulting Agreement is improper because it in essence presupposes a legal conclusion that is for this
court to decide not the parties.
[14] *See* Cardella Decl. ¶ 8, Moyle Decl. ¶ 7.
[15] Cardella Depo. 150:18

agreements had to be finalized and signed in order for there to be a Closing.[16]  Moyle, however,

also stated that it "could have been part of posturing in negotiation."[17]  Defendant Castelli

testified that he communicated the need to have the Consulting Agreements for the Closing to

take place.[18]  Finally, Catherine Debreceny an attorney at K&E who represented Castle Group

during the transaction, testified that she was "given instructions that the transaction was not to

close until the consulting agreements had been entered into and the terms of those agreed."[19]

   Based upon this evidence, and a review of the record, the court finds there is no dispute

concerning the fact that Plaintiffs were told the Consulting Agreements were necessary to close

the Transaction.  As noted by the Tenth Circuit in *Navair, Inc. v. IFR Americas, Inc.*,[20]

"Contracts are not formed by comparing mental states; they are formed by what the parties

*communicate*."[21]  Thus, Plaintiffs' subjective belief that the Consulting Agreements were not

necessary for the Closing does not, in the court's opinion, create a genuine issue of fact that

would prevent the resolution of the parties' summary judgment motions.

   On April 17, 2007, Cardella and Moyle each received a draft Consulting Agreement

prepared by Debreceny.

   On April 23, 2007, Cardella sent an email to his attorney Jeff Bahls, Moyle and Julian

Castelli of Castles Group that had an attached revised draft of the Consulting Agreement.

---

[16] *See* Moyle Depo. 78:12-16.
[17] *Id.* at 15-16.
[18] *See* Castelli Depo. 141:6-22.
[19] Debreceny Depo. 13:17-19.
[20] 519 F.3d 1131 (10th Cir. 2008).
[21] *Id.* at 1138.

Cardella's email stated "Julian – I have attached our changes to the Consulting Agreement. Jamie [Moyle] and I require the same agreement terms and thus this redline contains all of our collective changes, so at least you won't have to do this twice."[22]

On the night of April 24, 2007, at approximately 9:10 pm PDT, Debreceny emailed a revised draft of the Consulting Agreement to Cardella.  The Closing of the Transaction was scheduled to take place on the next day April 25, 2007.

Cardella made some changes to the revised draft of the Consulting Agreement, informed Castelli that he had done so, and signed the revised Consulting Agreement.  Moyle signed a separate signature page reflecting his agreement with the terms of the 4/24/07 draft.  Cardella faxed the 4/24/07 draft with his and Moyle's signature pages to Castelli at approximately 12:03 am PDT on April 25, 2007.

Castelli reviewed the 4/24/07 draft, including the changes made by Cardella and Moyle to it and sent an email to Debreceny that stated: "The consulting agreement with signatures is coming by fax, not email since they were unable to create a pdf at home.  They'll get a scanned version tomorrow.  In fact, you may want to get them a clean set to sign tomorrow, but at least we have the signatures."[23]

Debreceny saw Castelli's email on the morning of April 25th, and after not finding any faxes as she expected, Debreceny sent an email to Cardella.  She stated: "Jonathan I understand

---

[22] Cardella email dated April 23, 2007, attached as exh. 13 to Defs' mem. in supp.
[23] Castelli email dated 4/25/2007 2:56 am, attached as exh. 20 to Defs' mem. in supp.

[sic] I was supposed to receive a fax from you last night with signature pages – I do not have such a fax.  Please send these pages as soon as possible as we cannot close without them."[24]

At some point after sending this email to Cardella and before Cardella responded to it, Debreceny testified that she spoke to Castelli regarding the Consulting Agreements.[25]  Castelli told Debreceny that Cardella and Moyle had faxed him a copy of the Consulting Agreement along with signature pages that they had each signed.  Castelli told Debreceny he accepted all of the proposed changes and had faxed to her on April 24, 2007, his signature pages, which he gave consent to use for the Consulting Agreement.[26]  Debreceny further testified that it was at this point where she "was satisfied that there was a final binding agreement between Jonathan and Mountain Reservations and Jamie and Mountain Reservations and that we could proceed with the closing."[27]

After speaking with Castelli, Debreceny received an email response from Cardella regarding the signature pages to the 4/24/07 draft.  Cardella's email stated: "Catherine, last night Jamie and I executed the mutual release (from OSTK[28] that Julian required and put together) as well as the Consulting Agreements.  We are not executing the subscription agreement(s) because Tom Raudorf and Alan Mao will be retaining all shares, including those earmarked for James

---

[24] Debreceny email dated 4/25/2007 8:56 am, attached as exh. 21 to Defs' mem. in supp.
[25] Debreceny Depo. 29:1-3.
[26] The signature pages are attached as exh. 22 to Defs' mem. in supp.
[27] Debreceny Depo. 29:20-23.
[28] This acronym refers to Overstock.

and I.  Thus, you should not need any more signatures from Jamie or I.  Regards, Jonathan."[29]

Debreceny stated this email from Cardella confirmed to her that they had received the signature

pages from Cardella and Moyle for the Consulting Agreement and that Plaintiffs also signed the

Mutual Release Agreement.[30]   As a follow-up to Cardella's email, Debreceny sent an email to

Cardella with a copy to Julian Castelli that stated: "Thank you Jonathan we have received your

signature pages.  Julian could you please give me a call when you can to discuss the share

distribution.  Thanks Cath."[31]

 Later that morning on April 25th, the closing took place.  Before transferring the money

to Overstock from Castles Travel, Debreceny testified that she confirmed that all documents had

been finalized and signed.[32]

 Later that same day at least four emails concerning the Transaction and the Closing were

sent with the subject "Congratulations."  All these emails were sent to a number of individuals

including both Plaintiffs.  At approximately 3:51 pm an email was sent from Corwynne

Carruthers of Kinderhook industries.  It states in part, "On behalf of Kinderhook, I would like to

thank each individual for their hard work and dedication over the past two months to close this

transaction."[33]  At 4:12 pm an email was sent from George Trevino of Castles Media.  It states:

"Thank you and the whole East Peak team as well.  We appreciate all your work in facilitating

---

[29] Cardella email dated 4/25/07 10:52 am, attached as exh. 15 to Defs' mem. in supp.
[30] *See* Debreceny Depo. 32:22-25.
[31] Debreceny email dated 4/25/07 10:56 a.m., attached as exh. 23 to Defs' mem. in supp.
[32] *See* Debreceny Depo. 33:21-25, 34:1-2.
[33] Carruthers email dated 4/25/07 3:51 pm, attached as exh. 24 to Defs' mem. in supp.

this transaction.  Best regards, George."[34]  At 4:38 pm an email was sent from Tom Thornhill of

East Peak Advisors.  It states in part: "On behalf of East Peak Advisors, I would like to

congratulate everyone on the closing of the transaction."[35]  And finally, about an hour after this

email, Mr. Thornhill resent this same email at 5:38 pm.

On April 26, 2007, the day after the closing, Castelli sent an email to Cardella stating in

part: "I understand from Eddie [Christensen] that you have the signed version of your docs.  Let

me know if you need any other help from me in that regard.  Please let me know the status of the

PR draft.  I was hoping to have it complete by this evening so we can share it with our

employees at the party tonight, prior to posting it on our web site."[36]  About three minutes after

receiving this email Cardella responded stating: "Julian, Thank you for following up on this

matter.  You are correct, <u>we have fully executed contracts</u>.  Regarding the press release, I will

have you a draft today."[37]

Later that same day Cardella sent Castelli another email with the attached press release.

Cardella also copied the email to Plaintiff Moyle as well as other individuals.  Cardella states:

"Julian, Please find attached the press release, as requested.  Let me know if you would like any

modifications or have any questions.  Once we incorporate your changes and have sign off on the

release, as well as the quotes by you and George . . ., then we can discuss how you would like to

---

[34] Trevino email dated 4/25/07 4:12 pm, attached as exh. 24 to Defs' mem. in supp.

[35] Thornhill email dated 4/25/07 4:38 pm, attached as exh. 24 to Defs' mem. in supp.

[36] Castelli email dated 4/26/07 9:54 am, attached as exh. 25 to Defs' mem. in supp.

[37] Cardella email dated 4/26/07 9:57 am, (emphasis added), attached as exh. 25 to Defs' mem. in supp

run the release (e.g. which wire(s), web sites, and which news papers, industry journals, etc. that

you would like to submit it to). Regards, Jonathan."[38]

The press release prepared by Cardella, which apparently was released to the public,

contains the following:

> OTravel.com, Inc. Renamed Mountain Reservation, Inc.
> And Take On New Executive Leadership
> . . .
> Salt Lake City, U.T. – April 26th, 2007 – Otravel.com, Inc. formerly a wholly owned
> subsidiary of Overstock.com . . ., was purchased yesterday by an affiliate of Kinderhook
> Industries, LLC, and renamed Mountain Reservations, Inc. . . . .
>
> [Castelli is quoted as follows] We have successfully retained Mr. Raudorf, Mr. Mao, and
> Mrs. Nuqui in key executive positions as well as the founders and former officers, Mr.
> Cardella and Mr. Moyle as advisors and consultants to the company.
> . . . .[39]

Neither Cardella or Moyle were sent a copy of the 4/24/07 draft Consulting Agreement

with Castelli's signature.  Instead, following the Closing, Castelli told Cardella that Debreceny

would be sending him an "Execution Copy" of the 4/24/07 draft Consulting Agreement for him

and Moyle to sign.  The purpose of the Execution Copies was to have a clean version of the

4/24/07 draft that eliminated all the redlining.

**D.  The Execution Copy**

On April 27, 2007, following the closing, Debreceny emailed Cardella attaching an

unsigned "Execution Copy" of the Consulting Agreement.  Debreceny states: "Jonathan, please

---

[38] Cardella email dated 4/26/07 2:17 pm, attached as ech. 26 to Defs' mem. in supp.
[39] Press release dated April 26, 2007, attached as exh. 26 to Defs' mem. in supp.

find attached the execution copies of your and Jamie's consulting agreements.  I've also attached a black line showing the changes since the last versions of your consulting agreement that you reviewed.  Please let me know if you have any issues as soon as possible.  Regards Cath."[40]

The Execution Copy sent by Debreceny was nearly identical to the 4/24/07 draft Consulting Agreement, but there were three changes to it.  First, the phrase K&E Draft 4/24/07 that appeared in the upper right hand corner of the 4/24/07 draft Consulting Agreement was modified to read Execution Copy.  Second, the format of the text of the 4/24/07 draft was changed from left justification to full justification.  And third, the word "material" in section 4(b) was repositioned.  In the 4/24/07 draft Consulting Agreement, the sentence in Section 4(b) reads: "For purposes of this Agreement, "Cause" shall mean . . . (ii) deliberate dishonesty or material breach of fiduciary duty to the Company or any affiliate of the Company, . . . ."[41]  In the Execution Copy of the Consulting Agreement this sentence was changed to read: "For purposes of this Agreement, "Cause" shall mean . . . (ii) material deliberate dishonesty or breach of fiduciary duty to the Company or any affiliate of the Company, . . . ."[42]

On May 1, 2007, Cardella sent an email back to Debreceny, with a copy to Moyle, which states: "Catherine, At a glance, the changes look fine.  Are they any different than the copy we

---

[40] Debreceny email dated 4/27/07 4:19 pm, attached as ech. 29 to Defs' mem. in supp.
[41] 4/24/07 draft Consulting Agreement p. 2.
[42] Execution Copy p. 3.

already executed and sent back to you (I haven't compared them)?  Do you want us to execute

this final draft now to replace the draft from the closing?  Please let us know."[43]

On May 2, 2007, Debreceny responded to Cardella's email with a return email that was

copied to Moyle.  Debreceny states:

> Jonathan they are the same as the versions you sent over except for the following change
> in the placement of material in the definition of cause.  The intent is to have a clean,
> approved copy that we can include in the closing sets – <u>we can use the signatures that you
> have already provided</u>, I just wanted to confirm the form for our records.  On your
> confirmation that the change below is OK we will include the version in the closing sets
> and in your records at the Company.  Thanks, Cath

> For purposes of this Agreement, "<u>Cause</u>" shall mean . . . (ii) **material** deliberate
> dishonesty or ~~material~~ breach of fiduciary duty to the Company or any affiliate of the
> Company; . . . ."[44]

About an hour later on the same day, Cardella sent a response via email, also copying

Moyle, which states:

> I accept the language below for the final clean version;

> For purposes of this Agreement, "<u>Cause</u>" shall mean . . . (ii) **material** deliberate
> dishonesty or ~~material~~ breach of fiduciary duty to the Company or any affiliate of the
> Company; . . . .

> Jonathan[45]

After receiving Cardella's email, Debreceny sent an email back copying Moyle stating "Great

thank you."[46]  Neither Cardella or Moyle ever signed the Execution Copy.

---

[43] Cardella email dated 5/1/07 10:27 am, attached as exh. 30 to Defs' mem. in supp.
[44] Debreceny email dated 5/1/07 10:58 am, (first emphasis added), attached as exh. 30 to Defs' mem. in supp.
[45] Cardella email dated 5/1/07 11:38 am, attached as exh. 31 to Defs' mem. in supp.
[46] Debreceny email dated 5/2/07 11:45 am, attached as exh. 31 to Defs' mem. in supp.

On June 5, 2007, Cardella sent Debreceny an email which was copied to Julian Castelli. Cardella's email says: "Dear Catherine and Julian,  Jamie and I have thought long and hard about Mountain Reservations and our roles going forward.  To address your requests and clarify the issue, we have written and signed the attached letter.  Sincerely, Jonathan Cardella and James Moyle."[47]  Attached to the email is a letter signed by Cardella and Moyle that states in part:

> Dear Julian and Catherine,
>
> The recent negotiation of the Consulting Agreement has helped us to realize that this deal is not and has never been in our best interests. . . . .
>
> We are constantly asked to sign new documents. . . . .
>
> From everything we see there has been no meeting of the minds on the consulting work we should be doing, no exchange of valuable consideration from the Company to us or vice versa, and there is no executed contract nor agreement on terms.  Under these circumstances, we decline to proceed further. . . . .
>
> Sincerely,
>
> Jonathan Cardella                    James Moyle[48]

Approximately ten days after this email-and following the realization by Defendants that they had failed to pay Plaintiffs their consulting fees according to either the 4/24/07 draft Consulting Agreement or the Execution Copy-Defendants wired $10,000 to Cardella's bank account and $10,000 to Moyle's bank account.  This was payment for Plaintiffs' services under the alleged Consulting Agreement from April 25, 2007 through May 31, 2007.  Three days later

---

[47] Cardella email dated 6/5/07 9:27 pm, attached as exh. 33 to Defs' mem. in supp.
[48] Letter from Cardella and Moyle, *id.*

on June 18, 2007, Cardella became aware of the wire transfer from Defendants into his bank account and sent an email to Castelli stating that he objected to the payment and was taking steps to return the $10,000.  Shortly thereafter both Plaintiffs returned their deposits from Mountain Reservations.[49]

On October 16, 2008, Mountain Reservations again tendered payment to Cardella and Moyle for consulting fees allegedly owned under the Consulting Agreement for the period from April 25, 2007 to June 5, 2007.[50]  Defendants sent each Plaintiff a check that had the Mountain Reservations company logo on it in the amount of $11,388.89.  There is no record of Plaintiffs cashing the checks.

**E.  Terms in the 4/24/07 Draft and Execution Copy**

As noted previously, the Execution Copy and the 4/24/07 draft are nearly identical save primarily for the placement of the word "material" in Section 4(b).  During her deposition Debreceny testified that this change was done to make it consistent with the same provision found in the Employment Agreements with Raudorf, Mao and Nuqui, all former employees of OTravel.[51]  Debreceny further testified that this change would make it harder for there to be a cause for termination – i.e. according to Debreceny, the revised clause favored Plaintiffs.  But, during her deposition, Debreceny admitted the change of the word material left open the questions of whether "material" modified "breach of fiduciary duty" and whether a breach of

---

[49] *See* Cardella email dated 6/18/07 3:30 pm, attached as exh. 34 to Defs' mem. in supp.
[50] *See* exh. J to Defs' op. mem.
[51] *See* Debreceny Depo. 39:10-23.

fiduciary duty had to be material in order for a "for cause" termination to be allowable or open to interpretation.  And therefore, the question of whether moving the word material-from its place in the 4/24/07 draft to that in the Execution Copies-is material under the law and remains open.

Both the 4/24/07 draft and the Execution Copies contain a non-compete provision specifying that Plaintiffs will not compete "for a period thereafter the greater of (s) three years from the date here of and (y) eighteen months from the termination of the Consulting Period."[52] Both alleged agreements also contain the following:[53]

> NOW THEREFORE, in consideration of the premises and mutual covenants set forth herein, and other consideration, the receipt of which is hereby acknowledged, the parties hereto hereby agree as follows:
>
> 1.  Consulting The Company agrees to engage Consultant, and Consultant hereby accepts engagement with the Company as an independent contractor,  and not as an employee, to serve as consultant to the Company, upon the terms and conditions as set for the in this Agreement . . . .
>
> 3.  Compensation Reimbursement
>
>   A.  Consulting Fee.  During the Consulting Period, Consultant's fee shall be in an amount equal to $100,000 per annum which fee shall be payable in equal monthly installments, in arrears on the last day of each calendar month.
>   B.  Expenses.  The Company shall reimburse Consultant for all reasonable out-of-pocket expenses incurred by him in the course of performing his duties under this Agreement which are consistent with the Company's policies in effect from time to time with respect to travel, entertainment and other business expenses, subject to the Company's general requirements with respect to reporting and documentation of such expenses provided however that in order to qualify for reimbursement any such individual expenses in an amount in

---

[52] 4/24/07 draft Consulting Agreement p. 5.
[53] For ease of convenience the court cites to the 4/24/07 draft, but as noted, these provisions are the same as those in the Execution Copies.

excess of $2000 must be approved by the Chief Executive Officer of the
Company prior to being incurred. . . . .

7.  <u>Non-Solicitation; Non-Competition.</u>

In addition, except for services and duties performed pursuant to this Agreement by
Consultant for or on behalf of the Company or any affiliate of the Company during
the Consulting Period, Consultant agrees that, during the Consulting Period and for
the Restricted Period thereafter, Consultant will not for any reason whatsoever,
directly or indirectly, for himself or on behalf of or in conjunction with any other
person, persons, company partnership, corporation, business or other entity of
whatever nature, engage in any respect, whether as an officer, director, employee,
independent, contractor, advisor, sales representative, consultant, shareholder, owner,
partner, manager or in any other capacity, in any business involving or similar to any
existing products or services marketed, licensed and/or sold by the Company or any
affiliate of the Company anywhere in the United States of America including without
limitation of the business of the Company or any member of the Company Group
during the Consulting Period, including without limitation the business of marketing,
selling and brokering vacation rentals and/or vacation packages to resorts.[54]

## **<u>STANDARD</u>**

Federal Rule of Civil Procedure 56 permits the entry of summary judgment "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law."[55]  The court must "examine the factual record

and reasonable inferences therefrom in the light most favorable to the party opposing summary

judgment."[56]  "The mere existence of a scintilla of evidence in support of [a party's] position

---

[54] 4/24/07 draft Consulting Agreement (first emphasis added).
[55] Fed.R.Civ.P. 56(c); *see also* *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Alder v. Wal-Mart Sotres, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).
[56] *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990).

will be insufficient [to overcome a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [respective party]."[57]

### ANALYSIS

The overall issue here is whether there is a contract between the parties and if so, is it enforceable?  There is no dispute that the 4/24/07 draft was a counter-offer sent by Plaintiffs on the morning of April 25, 2007 to Defendants.  This counter-offer leads to the following specific questions before the court: (1) did Defendants accept Plaintiffs' counteroffer, and exactly how did Defendants need to communicate this acceptance to Plaintiffs in order to establish a contract; (2) whether the parties reached a meeting of the minds as to the terms of any alleged contract; (3) did Defendants' lack of payment pursuant to the alleged Consulting Agreement(s) equate to a material breach that renders any contract unenforceable; (4) does the statute of frauds render the Execution Copies of the alleged contracts void; and (5) are the non-compete covenants within the Consulting Agreements necessary to protect Defendants' legitimate business interests.

Under Utah law-which governs this contract dispute-the essential elements of a contract require offer and acceptance, competent parties, consideration and a meeting of the minds.[58]  "A meeting of the minds between contracting parties is essential to the formation of any contract: A condition precedent to the enforcement of any contract is that there be a meeting of the minds of

---

[57] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1175 (10th Cir. 1999) ("A mere scintilla of evidence supporting the nonmoving party's theory does not create a genuine issue of material fact.").
[58] *See Uhrhahn Constr. & Design, Inc. v. Hopkins*, 2008 UT App 41 ¶ 12, 179 P.3d 808; *Heideman v. Washington City* 2007 UT App 11 ¶ 25, 155 P.2d 900.

the parties, which must be spelled out, either expressly or implicitly, with sufficient definiteness to be enforced."[59]  "The burden of proving the existence of a contract is on the party seeking enforcement of it."[60]

## A. Was a Contract Created Between the Parties?

At the outset the court notes that both the 2007 SPA and the Mutual Release Agreement contain merger clauses.  Plaintiffs argue the merger clauses prevent the introduction of extrinsic evidence regarding any relation between the consideration found in the 2007 SPA, the Mutual Release Agreement and the Consulting Agreements.  The court disagrees.

The 4/24/07 draft Consulting Agreement and the Execution Copies both state "in consideration of the promises and mutual covenants set forth herein, and other consideration, the receipt of which is hereby acknowledged, the parties hereto hereby agree as follows: . . . ."[61] Because the draft agreement and the Execution Copies both mention "other consideration" the court may look to the entire transaction to determine what consideration exists to support an agreement.[62]

---

[59] *Commercial Union Assoc. v. Clayton*, 863 P.2d 29, 37 (Utah Ct. App. 1993); *see also* *Pingree v. Continential Group of Utah, Inc.*, 558 P.2d 1317, 1321 (Utah 1976).

[60] *Oberhansly v. Earle*, 572 P.2d 1384, 1386 (Utah 1977); *B&R Supply Co. v. Bringhurst*, 28 Utah 2d 442, 503 P.2d 1216 (1972).

[61] 4/24/07 draft p. 1.

[62] *DeMentas v. Estate of Talls*, 764 P.2d 628, 631 (Utah Ct. App. 1988) (concluding extrinsic evidence was properly admitted to determine whether or not there was consideration for a promise).

**(i) Offer and Acceptance**

Plaintiffs do not dispute that they signed the 4/24/07 draft.  Under basic contract law the 4/24/07 draft Plaintiffs sent to Castelli shortly after midnight on April 25th constituted a counteroffer to Defendants.[63]  There is also no dispute among the parties that Castelli reviewed the changes Plaintiffs made to the 4/24/07 draft, and that on the morning of the 25th, Castelli spoke with Debreceny telling her that he had accepted all these changes.  Castelli went on to tell Debreceny to use his signature pages for the 4/24/07 draft.  The parties also do not dispute the fact that Castelli neither in person, nor via verbal communication, told Plaintiffs "I accept."  Plaintiffs were never sent a copy of the 4/24/07 draft with Castelli's signature.  What is in dispute, however, is whether Defendants accepted Plaintiffs' counteroffer; whether there was a meeting of the minds concerning the 4/24/07 draft; and exactly how-presuming Defendants did accept Plaintiffs' counteroffer-did Defendants need to communicate their acceptance.

Plaintiffs argue there was no acceptance by Defendants of the 4/24/07 draft.  Plaintiffs assert a party "cannot accept a contract in private . . . and expect that acceptance to be binding when it was never conveyed to the other side in any meaningful manner or, in fact, any manner at all."[64]  Plaintiffs further argue there was "no meeting of the minds with regard to the K&E 4/24/07 Draft as said draft was subsequently revised by the Defendants <u>after</u> the Plaintiffs

---

[63] *See Cal Wordsworth Constr. v. City of St. George*, 865 P.2d 1373, 1376 (Utah Ct. App. 1993) ("'A reply to an offer, though purporting to accept it, which adds qualifications or requires performance of conditions, is not an acceptance but is a counter-offer.'") (quoting *R.J. Daum Constr. Co. v. Child*, 122 Utah 194, 247 P.2d 817, 821 (1952)).

[64] Tr. p. 12.  Tr. designated the transcript from oral arguments held before this court on the parties' cross-motions for summary judgment.

revised and signed it."[65]  "If there was a meeting of minds . . . as to the 4/24/07 K&E Draft of the

Consulting Agreement, as modified and signed by the Plaintiffs, then the terms would not have

been further changed by the Defendants."[66]

     In contrast, Defendants argue a meeting of the minds was reached and there was an

acceptance of Plaintiffs' counteroffer.  According to Defendants, "[w]here an offer does not

specify the manner of acceptance, the offeree may accept in any reasonable manner."[67]  In

support of their argument Defendants cite to *Becker v. HAS/Wexford Bancgroup, LLC*[68] and

*Commercial Union Assocs. v. Clayton.*[69]

     *Commercial Union* involved a lessor who brought action against a medical corporation

who was the lessee, for breach of lease.  On appeal, the lessee argued that the trial court erred in

holding that the lessee had ratified the lease through the doctrine of part performance.  The Utah

Court of Appeals rejected this argument and stated:

> 'It is a fundamental contract law that the parties may become bound by the terms of a
> contract even though they did not sign the contract, where they have otherwise indicated
> their acceptance of the contract, or led the other party to so believe that they have
> accepted the contract.'[70]

---

[65] Plas' mem. in supp. p. 12.
[66] *Id.* at p. 13.
[67] Defs' mem. in supp. p. 2.
[68] 157 F.Supp.2d 1243 (D.Utah 2001).
[69] 863 P.2d 29 (Utah Ct. App. 1993).
[70] *Id.* at p. 34 (quoting *Ercanbrack v. Crandall-Walker Motor Co.*, 550 P.2d 723, 725 (Utah 1976) (quoting 17 Am.Jur.2d Contracts § 70)) (quotations omitted).

The court then cited to a number of cases which support the position that a signature is not always necessary to create a binding agreement.[71]

In *Becker*, the plaintiffs sued a foreign financial institution alleging a default on loan commitments, breach of contract, quasi-contract and promissory estoppel.  Judge Campbell, from this court, cited to the *Commercial Union* decision from the Utah Court of Appeals in determining that a "party can indicate its intention to enter into a binding contract through its actions rather than its signature."[72]  Judge Campbell goes on to state:

> It is axiomatic that a party may become bound through its performance to a contract that it has not signed ... It is a fundamental contract law that the parties may become bound by the terms of a contract even though they did not sign the contract, where they have otherwise indicated their acceptance of the contract, or led the other party to so believe that they have accepted the contract.... It is established that a signature is not always necessary to create a binding agreement.... It is likewise established that the purpose of a signature is to demonstrate 'mutuality of assent' which could as well be shown through the conduct of the parties.... <u>That [a party] failed to sign the agreement is immaterial for any written contract though signed only by one of the parties binds the other if he accepts it and both act in reliance on it as a valid contract</u>.... If a person has accepted a written agreement and has acted upon it he is bound by it, although he may not have set his hand to the document.[73]

Based on the foregoing, the court agrees with Defendants.  The counteroffer by Cardella and Moyle did not require a particular means of acceptance.  Defendants, were therefore, free to

---

[71] *See id.*; *see also* <u>*City and County of Denber v. Adolph Coors Co.*,  813 F.Supp 1476, 1480 (D.Colo. 1993)</u> ("the purpose of a signature is to demonstrate 'mutuality of assent' which could as well be shown by the conduct of the parties") (citation omitted); <u>*N.L.R.B. v. Local 825, Intern. Union of Operating Engineers*, 315 F.2d 695, 699 (3d Cir. 1963)</u> ("That [a party] failed to sign the agreement is immaterial for any written contract though <u>signed only by one of the parties binds the other</u> if he accepts it and both act in reliance on it as a valid contract.") (emphasis added).

[72] <u>*Becker*, 157 F.Supp.2d 1243, 1248.</u>

[73] *Id.* at 1248-49 (emphasis added).

accept the counteroffer in a reasonable manner.  The court looks to the parties' conduct to determine if there was a mutuality of assent between the parties.

Plaintiffs argue their conduct did not ratify the 4/24/07 draft.  The court disagrees.  A review of the communications between the parties undermines Plaintiffs' contention.  First, as noted previously by the court, Plaintiffs were told that the Consulting Agreements were necessary to close the Transaction.  In addition to the deposition testimony supporting this fact, Debreceny sent Cardella an email on the morning of the Closing after failing to find any agreements or signature pages as she expected.  Debreceny stated: "Jonathan I uinderstand [sic] I was supposed to receive a fax from you last night with signature pages – I do not have such a fax.  Please send these pages as soon as possible as <u>we cannot close without them</u>."[74]  "Them," in this case appears to suggest there was more than one agreement necessary for the Closing.  Cardella's response to this email supports this conclusion.  Cardella responds saying: "Jamie and I executed the mutual release . . . as well as the Consulting Agreements."[75]  In this same email Cardella tells Debreceny that they are not executing the stock subscription agreements and that "you should not need any more signatures from Jamie or I."[76]  Shortly after receiving this email, Debreceny responded: "Thank you Jonathan we have received your signature pages."[77]

Following the Closing, Plaintiffs received at least four congratulatory emails concerning the Closing and the efforts undertaken by various parties in completing the Transaction.  The

---

[74] Debreceny email dated 4/25/07 8:56 am (emphasis added).
[75] Cardella email dated 4/25/07 10:52 am
[76] *Id.*
[77] Debreceny email dated 4/25/07 10:56 am.

next day on April 26, 2007, Cardella and Castelli exchanged emails concerning a press release that would announce the transaction to the public.  In one of these emails Cardella specifically states "we have fully executed contracts"[78] and then reassures Castelli that a draft press release is on its way.  Cardella sends Castelli the draft press release later that day.  The press release prepared by Cardella specifically mentions the purchase of OTravel by Defendants and notes that Cardella and Moyle were retained as "advisors and consultants to the company."[79]

Next, there is nothing before the court to indicate that Plaintiffs did not receive the money from the release of escrow funds that was specifically "[c]onditioned upon closing the sale of all or substantially all of the capital stock to O'Travel.com."[80]  The parties spend much time arguing about whether or not the Consulting Agreement was a precondition to the 2007 SPA and whether the 2007 SPA, Mutual Release and Consulting Agreement were all interrelated documents necessary for the Transaction.  Regardless of these arguments, the fact remains that had the Closing not taken place Plaintiffs would not have received the escrow funds pursuant to the Mutual Release.  Plaintiffs' receipt of these funds is further evidence that the Closing occurred.

Plaintiffs next argue their conduct after Closing was simply the same as that before the Closing.  Plaintiffs assert that they had "been aiding in the transition of the company from Overstock.com to Castles Travel since their resignation from Otravel on April 9, 2007, as they

---

[78] Cardella email dated 4/26/07 9:57 am.
[79] Press release dated April 26, 2007.
[80] Mutual Release Agreement p. 2.

wanted to see it succeed."[81]  The services Plaintiffs provided from April 10, 2007 to April 24,

2007, were not within any draft of the Consulting Agreement.  So, after the closing Plaintiffs

were providing similar services, while anticipating "the *possibility* of a final consulting

arrangement being entered into."[82]  The court finds Plaintiffs' position unpersuasive.

Plaintiffs' resignation date of April 10, 2007 in the Mutual Release Agreement, appears

to be a negotiated resignation date, not a date where Plaintiffs resigned, and then afterward

simply acted altruistically because they wanted their company to succeed.[83]  If Plaintiffs had

failed to help during the transition period it is doubtful they would have been compensated

pursuant to the Mutual Release Agreement.  Further, the press release and emails exchanged

between the parties indicate a working relationship among Plaintiffs and Defendants that the

court finds is different than that found before the closing.

Based upon the foregoing evidence, the court finds that Defendants accepted Plaintiffs'

counteroffer.  The evidence demonstrates that following Closing both parties acted like a

contract had been reached between the parties.

Plaintiffs next assert that if the Consulting Agreement had been executed then they would

have been paid for their services on both April 30, 2007 and May 31, 2007.  Plaintiffs were never

paid and Plaintiffs never inquired about it because "they never considered the Consulting

---

[81] Plas' reply p. 5.
[82] *Id.* p. 6.
[83] *See* Mutual Release p. 2 ¶ 1.

Agreement to have been executed."[84]   The undisputed fact that Defendants failed to timely pay Plaintiffs under the alleged Consulting Agreement does lend some support to Plaintiffs' position. But, Plaintiffs own emails and conduct undermine this argument because Plaintiffs thought the parties "had fully executed contracts."   And, when this nonpayment is taken in context with the other facts in this case-including the reasons provided by Defendants for not paying Plaintiffs-the court finds that nonpayment is not enough to demonstrate that an agreement was not reached by the parties.

Finally, Plaintiffs take issue with the fact that they were not reimbursed for travel expenses incurred following the closing while doing work for Defendants.   According to Defendants, if they had been reimbursed then this would be evidence that Defendants thought a contract had been formed.   The 4/24/07 draft states that reimbursement of out-of-pocket expenses is "subject to the Company's general requirements with respect to reporting and documentation."[85]   There is no evidence that Plaintiffs sought reimbursement with the proper documentation.   And, the evidence in the record indicates Cardella was on personal business during some of the time following the Closing; such personal business would not be a reimbursable out-of-pocket expense.   The lack of reimbursement for travel expenses is not dispositive here.

---

[84] *Id.*
[85] 4/24/07 draft p. 3.

**(ii) Meeting of the Minds**

Plaintiffs next contend that the terms of the 4/24/07 draft consulting agreement are not definite or certain.  Plaintiffs allege that the "Defendants never accepted the Plaintiffs' counteroffer but, instead, responded with a counter-counteroffer (the "Execution Copy") which substantively changed the placement of the word 'material.'"[86]  Accordingly, this counter-counteroffer indicates that there never was an agreement to begin with.

In contrast, Defendants argue Castelli accepted the changes in the 4/24/07 draft and the "parties reached an agreement as to the essential terms of their contract."[87]  In essence, the "request for Execution Copies was nothing more than an offer to amend the [4/24/07 draft consulting agreement]."[88]

"A meeting of the minds between contracting parties is essential to the formation of any contract: A condition precedent to the enforcement of any contract is that there be a meeting of the minds of the parties, which must be spelled out, either expressly or implicitly, with sufficient definiteness to be enforced."[89]  "'[P]arties to a contract may, by mutual consent, modify any or all of a contract.'"[90]  "'A valid modification of a contract . . . requires "a meeting of the minds of the parties, which must be spelled out, either expressly or impliedly, with sufficient

---

[86] Reply p. 8.
[87] Defs' mem. in supp. p. 8.
[88] *Id.*
[89] *Commercial Union Assoc. v. Clayton*, 863 P.2d 29, 37 (Utah Ct. App. 1993); *see also Pingree v. Continental Group of Utah, Inc.*, 558 P.2d 1317, 1321 (Utah 1976).
[90] *Harris v. IES Assoc. Inc.*, 2003 UT App 112, ¶ 45, 69 P.3d 297, 310 (quoting *Pasker, Gould, Arnes & Weaver, Inc. v. Morse*, 887 P.2d 872, 877 (Utah Ct. App. 1994)).

definiteness."'"[91]  "[T]he burden of proof for showing the parties' mutual assent . . . is on the party claiming that there [has been a modification]."[92]

Once again the conduct of the parties supports a meeting of the minds as to the 4/24/07 draft.  Plaintiffs signed the draft, their emails reflected an agreement had been reached, the Closing occurred on April 25, 2007 and work was done by Plaintiffs following the Closing that was consistent with the 4/24/07 draft being considered a contract.

Defendants did not need to send a signed copy of the 4/24/07 draft to Plaintiffs because the conduct of the parties and the evidence surrounding the Closing indicate that Defendants had accepted Plaintiffs' changes and an agreement had been reached.  The essential elements of a contract were present and a meeting of the minds was reached to form a contract.  Thus, the court concludes the 4/24/07 draft Consulting Agreement is a valid and enforceable contract between the parties.

In light of this conclusion, the court considers the Execution Copy to be an offer to modify the 4/24/07 draft consulting agreement and not a counter-counter offer as alleged by Plaintiffs.  The Utah Supreme Court has stated, "Where, . . ., parties later . . . modify other terms of a written contract, the remaining terms of the initial agreement still govern."[93]  So, even if Plaintiffs rejected the changes in the Execution Copy they would still be bound by the terms of the 4/24/07 draft Consulting Agreement.  Interestingly, the evidence actually supports a finding

---

[91] *Id.* (quoting *Richerd Barton Enters. Inc. v. Tsern*, 928 P.2d 368, 373 (Utah 1996) (quoting *Valcarce v. Bitters*, 12 Utah 2d 61, 362 P.2d 427, 428 (1961)) (alterations in original).

[92] *Id.* (quoting *Cal Wadsworth Constr. v. City of St. George*, 898 P.2d 1372, 1376 (Utah 1995)).

[93] *R.T. Nielson Co. v. Cook*, 2002 UT 11, ¶ 18, 40 P.3d 1119, 1125.

that Plaintiffs accepted the changes in the Execution Copy.  In an email sent by Cardella to

Debreceny, and copied to Moyle, Cardella states:

> I accept the language below for the final clean version;
>
> For purposes of this Agreement, "Cause" shall mean . . . (ii) **material** deliberate
> dishonesty or ~~material~~ breach of fiduciary duty to the Company or any affiliate of the
> Company; . . . .
>
> Jonathan[94]

The court addresses whether the Execution Copy is a valid modification to the 4/24/07 draft

Consulting Agreement later in the discussion concerning the statute of frauds.

Having concluded that the 4/24/07 draft is a contract between the parties, the court now

turns to Plaintiffs contention that even if there was a valid contract Defendants first breach

makes it unenforceable.

**B.  Did Defendants Breach of the 4/24/07 Consulting Agreement Render it Unenforceable?**

On June 5, 2007, Cardella sent Dereceny an email that was copied to Castelli "calling off

negotiations" on any consulting arrangement.  Approximately ten days after this email

Defendants sent payment according to the 4/24/07 draft to Cardella and Moyle.  Plaintiffs

returned this payment.  Defendants again sought to tender payment for Plaintiffs' services under

the Consulting Agreements on October 16, 2008, but Plaintiffs also rejected this payment.

Plaintiffs argue that the failure by Defendants to pay Plaintiffs "the only

compensation/consideration owed to them under [the 4/24/07 draft] constitutes a material 'first

---

[94] Cardella email dated 5/1/07 11:38 am, attached as exh. 31 to Defs' mem. in supp.

breach.'"[95]   And, therefore, any Consulting Agreement is unenforceable.  Defendants counter,

arguing that the breach was not material and if a breach is not material, then performance by the

non-breaching party is not excused.  Next, Defendants allege that regardless of any breach,

Cardella and Moyle are not excused from performance under the non-compete agreement found

within the Consulting Agreements based upon the principle of divisible contracts.  Defendants

cite to a Missouri case in support of this position.[96]

     "When one party to a valid contract commits an '<u>uncured material failure</u>' in its

performance of the contract, the non-failing party is relieved of its duty to continue to perform

under the contract."[97]   "'Failure of consideration [as opposed to lack of consideration] exists

wherever one who has either given or promised to give some performance fails without his fault

to receive in some material respect the agreed exchange for that performance.'"[98]

     Here, without even determining whether the breach was material, the evidence leads the

court to conclude that Defendants tried to cure their failure under the contract by sending

payment-although late-to Plaintiffs first on approximately June 15, 2007 and then on October 16,

2008.  Because Defendants sought to cure their failure under the 4/24/07 draft Consulting

---

[95] Op. p. 47.

[96] *See Fisher v. Nat'l Indus. Servs. Inc.*, 735 S.W.2d 114, 116 (Mo.Ct.App. 1987) (holding that an employer's promise to pay a bonus to an employee and the employee's promise not to compete were independent promises and not dependent upon each other).

[97] *Aquagen Intern. Inc. v. Calrae Trust*, 972 P.2d 411, 414 (Utah 1998) (quoting R*estatement (Second) of Contracts*, § 237 (1981)) (emphasis added).

[98] *Copper State Leasing Co. v. Blacker Appliance & Furniture Co.*, 770 P.2d 88, 91 (Utah 1988) (quoting *Bentley v. Potter*, 694 P.2d 617, 619 (Utah 1984)).

Agreement the court finds this case distinguishable from the case relied upon by Plaintiffs

*Aquagen Int'l Inc. v. Calrae Trust.*[99]

Additionally, Plaintiffs position is not supported by the materiality of the breach.  In

determining whether a breach is material Defendants suggest that this court look to the

Restatement of Contracts and the principles found within the substantial compliance doctrine

used in cases involving lease agreements.  In *Cache County v. Beus*,[100] the Utah Court of

Appeals cited to the Restatement of Contracts and stated that:

> the following factors can assist a court in determining the 'materiality' of a breach:
>
> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.[101]

Plaintiffs do not contest Defendants use of these factors and although this case does not involve a

lease like that in *Cache County* or *McKnight v. Midwest Eye Institute of Kansas City*,[102] the court

finds the factors outlined in *Cache County* helpful in determining whether Defendants breach

was material.[103]

---

[99] 972 P.2d 411 (Utah 1998).
[100] 978 P.2d 1042, 1050 (Utah App. 1999).
[101] *Id.* (citing to *Restatement (Second) of Contracts*: Circumstances Significant in Determining Whether A Failure is Material § 241 (1981)).
[102] 799 S.W.2d 909 (Mo. Ct. App. 1990).
[103] *See Restatement (Second) of Contracts*: Circumstances Significant in Determining Whether A Failure is Material

In looking at these factors the court concludes Defendants delay in making payment of consulting fees under the 4/24/07 draft Consulting Agreement was not material.  First, Plaintiffs were temporarily deprived of the benefit of the contract, but were paid the full amount owed although Plaintiffs did not accept this payment.  Second, Plaintiffs, as the injured party, can be compensated for the delay in payment by having Defendants calculate what is owed including applicable interest to Plaintiffs.  Third, there was no loss or forfeiture in these circumstances.  Fourth, as noted previously, Defendants sought to cure their failure.  And finally, there is no evidence before the court suggesting that Defendants failure to pay Plaintiffs was the result of bad faith.  Instead, this failure arose from an oversight in accounting.

In light of the foregoing the court concludes Defendants breach was not material and does not render the 4/24/07 draft Consulting Agreement unenforceable.

## C.  Does the Statute of Frauds Render the Execution Copies Void?

The Utah Statute of Frauds provides:

(1)  The following agreements are void unless the agreement, or some note or memorandum of the agreement, is in writing, signed by the party to be charged with the agreement:

    (a)  every agreement that by its terms is not to be performed within one year from the making of the agreement;[104]

Neither party disputes that by its terms the 4/24/07 draft Consulting Agreement is within the statute of frauds.  And, "'if an original agreement is within the statute of frauds, a subsequent

---

§ 241 (1981).

[104] Utah Code Ann. § 25-5-4 (2007)

agreement which modifies the original written agreement must also satisfy the requirements of the statute of frauds to be enforceable.'"[105]  Plaintiffs both signed the 4/24/07 draft Consulting Agreement so it complies with the statute of frauds, but the Execution Copy must also comply with the statute of frauds to be enforceable.

Plaintiffs argue that the Execution Copies, which are not signed by them, are void and unenforceable because they do not comply with the statute of frauds.

In opposition, Defendants offer four arguments.  First they argue the modifications found in the Execution Copies are not "material" so the statute of frauds doesn't apply.  Next, Defendants contend that even if the modifications were material the statute of frauds is satisfied by the email sent from Cardella to Debreceny on May 2, 2007.  Cardella stated: "I accept the language below for the final clean version."[106]  In support of this position Defendants cite to cases that found an email is a writing for purposes of the statute of frauds.  All of these cases are from other states, however, and none apply the Utah statute of frauds at issue here.  Third, Defendants allege the statute of frauds does not apply based upon Plaintiffs admission that there was a meeting of the minds with respect to the terms of the Execution Copies.  And finally, Defendants contend that Plaintiffs' part performance of their obligations in connection with the Execution Copies prevents the statute of frauds from voiding them.

---

[105] *In re Olympus Const., LC*, 2007 UT App 361 ¶ 11, 173 P.3d 192 (quoting *Golden key Realty, Inc. v. Mantas*, 699 P.2d 730, 732 (Utah 1985)); *Allen v. Kingdon*, 723 P.2d 394, 396 (Utah 1986) ("The rule is well settled in Utah that if the original agreement is within the statute of frauds, a subsequent agreement that modifies any of the material parts of the original must also satisfy the statute.")..

[106] Cardella email dated 5/1/07 11:38 am.

As noted by Plaintiffs, "'[T]he statute [of frauds] has long been construed narrowly and literally. . . .'"[107]  It provides that an agreement is "void unless the agreement, or some note or memorandum of the agreement, is in writing, signed by the party to be charged with the agreement."[108]

Here, Debreceny sent Cardella an email on May 2, 2007 that stated in part: "The intent is to have a clean, approved copy that we can include in the closing sets – <u>we can use the signatures that you have already provided</u>, I just wanted to confirm the form for our records.  On your confirmation that the change below is OK we will include the version in the closing sets and in your records at the Company.  Thanks, Cath"[109]  In response Cardella stated:

> "I accept the language below for the final clean version; For purposes of this Agreement, "<u>Cause</u>" shall mean . . . (ii) **material** deliberate dishonesty or ~~material~~ breach of fiduciary duty to the Company or any affiliate of the Company; . . . .
>
> Jonathan[110]

Debreceny specifically told Cardella the signatures which he and Moyle had already provided could be used.  Cardella did not oppose the use of his or Moyle's signatures for the Execution Copies and agreed to the modified language.  Agreeing to the modified language demonstrates a meeting of the minds between Plaintiffs and Defendants.  Based upon Cardella's representations, and the specific availability of Plaintiffs' signature pages, it would be

---

[107] *Heslop v. Bank of Utah*, 839 P.2d 828, 836 (Utah 1992) (quoting *Hodge v. Evans Fin. Corp*, 823 F.2d 559, 561-62 (D.C.Cir.1987)) (second alteration added) (citation omitted).
[108] Utah Code Ann. § 25-5-4.
[109] Debreceny email dated 5/1/07 10:58 am, (emphasis added).
[110] Cardella email dated 5/1/07 11:38 am.

appropriate to attach Plaintiff's signatures to the Execution Copies.  The signatures Plaintiffs

provided satisfy the statute of frauds so there is no need to determine whether Cardella's email

alone acts as a writing to satisfy the statute.  The court finds that the Execution Copies are valid

and enforceable modifications to the 4/24/07 draft Consulting Agreement because once again the

basic elements of a contract are present.

**D.  The Necessity of the Non-Compete Covenants**

Defendants allege that the non-compete covenants are necessary to protect their business

interests.  Plaintiffs dispute this allegation and argue that "at the very least there are material

facts in dispute regarding this issue."[111]  The disputed facts include: whether or not Plaintiffs had

inside knowledge of Defendants' operations, processes and procedures; whether Plaintiffs could

try to solicit Defendants' employees; Plaintiffs knowledge of what markets Defendants have

targeted and what strategies they intend to use; and whether Plaintiffs are able to compete with

Defendants and would such competition "devastate" Defendants in a "$650-billion industry."

On this point, the court agrees with Plaintiffs and finds that there are material facts regarding the

necessity of the non-compete covenants in dispute.  This issue is inappropriate for summary

judgment and will be left for trial.

---

[111] Plas' op. p. 53-54.

## **CONCLUSION**

Based upon the foregoing the court finds:

- Defendants accepted Plaintiffs' counteroffer regarding the 4/24/07 draft Consulting Agreement;

- the 4/24/07 draft Consulting Agreement is a valid enforceable agreement between the parties;

- Defendants sought to cure their breach of the agreement with Plaintiffs and this breach was not material;

- the Execution Copy is a valid and enforceable modification to the 4/24/07 draft Consulting Agreement

- the statute of frauds does not render either the 4/24/07 draft Consulting Agreement or the Execution Copies void

- there are material facts in dispute concerning the necessity of the non-compete portions of the contracts which will be decided at trial

Therefore, Plaintiffs' motion for summary judgment is DENIED and Defendants' motion for summary judgment is GRANTED IN PART.  In light of the fact that Plaintiff Moyle has settled with Defendants,[112] the court encourages Plaintiff Cardella and Defendants to attempt a resolution of their dispute.  If a resolution cannot be reached by May 1, 2009, the parties

---

[112] Docket no. 73.

are instructed to call the court to set up a time for a bench trial concerning the remaining

issues not resolved by this decision.


DATED this 7th day of April, 2009.


Brooke C. Wells
United States Magistrate Judge